Christine J. AMOS, Judy Bawden, Deniece Kanon, April Joyce Reding, Arthur Frank Mayson, Ruth Arriola, Shellen Adamson and Ralph L. Whitaker on behalf of themselves and others similarly situated, Plaintiffs,

v.

The CORPORATION OF the PRESIDING BISHOP OF the CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS, and the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints, Defendants.

Civ. No. C–83–0492W.

United States District Court,
D. Utah, C.D.

Sept. 18, 1985.

Elizabeth T. Dunning, David B. Watkiss, Molly B. Kenny, Salt Lake City, Utah, for plaintiffs.

Dan S. Bushnell, M. Karlynn Hinman, David P. Farnsworth, Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

The plaintiffs' motion for summary judgment and reconsideration and defendants' motion to strike were argued orally on May 17, 1985. The plaintiffs were represented by Elizabeth T. Dunning, David B. Watkiss and John E. Harvey. The defendants were represented by Wilford W. Kirton and Richard Boyle. Prior to the hearing, the court read carefully all memoranda of counsel. After the hearing, the court took the matter under advisement and has since reviewed the memoranda and depositions and has read all relevant authorities. Based on those materials and oral argument, the court renders the following decision and order.

### I. *Background*

A. History of This Case

The court is governed by its previous decision in this case, *Amos v. Corporation*

*of Presiding Bishop,* 594 F.Supp. 791 (D.Utah 1984) (hereinafter referred to as "Amos I"). At that time, the court ruled on defendants' motion to dismiss or in the alternative for summary judgment. That action was initiated when plaintiffs brought suit claiming violations of federal and state antidiscrimination laws. They claimed their termination from employment was based on their inability or refusal to satisfy worthiness requirements of the Mormon Church for temple recommends. Contending they were employees performing non-religious activities, they challenged the constitutionality of federal and state exemptions from antidiscrimination laws, 42 U.S.C. § 2000e–1 and Utah Code Ann. § 34–35–2(5), respectively. In addition, plaintiffs claimed the defendants wrongfully and intentionally inflicted extreme mental and emotional injury and distress on the plaintiffs by requiring them to be interviewed by church leaders concerning their eligibility for temple recommends.

In Amos I, the court set forth an analytical framework for determining whether an activity is religious in religious discrimination suits. That framework consists of a three prong test. Because that test must be applied to defendants' activities in the present motions, the court reiterates it in full here.

First, the court must look at the tie between the religious organization and the activity at issue with regard to areas such as financial affairs, day-to-day operations and management. Second, whether or not there is a close and substantial tie between the two, the court next must examine the nexus between the primary function of the activity in question and the religious rituals or tenets of the religious organization or matters of church administration. If there is a substantial connection between the activity in question and the religious organization's religious tenets or matters of church administration and the tie under the first part of the test is close, the court does not need to proceed any further and may declare the activity religious.... However, where the tie between the religious entity and activity in question is either close or remote under the first prong of the test and the nexus between the primary function of the activity in question and the religious tenets or rituals of the religious organization or matters of church administration is tenuous or nonexistent, the court must engage in a third inquiry. It must consider the relationship between the nature of the job the employee is performing and the religious rituals or tenets of the religious organization or matters of church administration. If there is a substantial relationship between the employee's job and church administration or the religious organization's rituals or tenets, the court must find that the activity in question is religious. If the relationship is not substantial, the activity is not religious.

594 F.Supp. at 799.

The court in Amos I applied that test to the activities of Deseret Gymnasium ("Deseret") and more specifically, to plaintiff Mayson's position there as a building engineer. The court concluded that the nature of Deseret's activities could not be considered to be religious. 594 F.Supp. at 802. Because the court concluded that Deseret's activities were not religious, the court considered the constitutionality of the exemption from Title VII, contained in Section 702, for employees performing secular, non-religious jobs. After a thorough review of the legislative history of that law and the Supreme Court pronouncements on the Religion Clauses of the first amendment, this court held that exemption to be unconstitutional. It found that "the direct and immediate effect of the exemption of religious organizations from Title VII for religious discrimination in secular, non-religious activities is to advance religion in violation of the establishment clause of the first amendment to the United States Constitution." 594 F.Supp. at 828.

The court in Amos I also considered whether Beehive Clothing Mills ("Beehive") and the jobs of the plaintiffs Amos, Baw-

den, Kanon and Riding[1] who were employed there, were religious in nature. The court determined that the issue could not be decided on the record that existed at that time. It therefore delayed ruling on Beehive until further discovery could be made.[2] 594 F.Supp. at 803. The court also dismissed plaintiffs' cause of action for intentional infliction of emotional distress. The court determined that defendants' conduct regarding the worthiness requirements and subsequent firing did not rise to the level of "outrageous and intolerable conduct" required under Utah law. 594 F.Supp. at 831.

After the court's decision in Amos I, the parties stipulated that plaintiffs could file a Second Amended complaint adding Ralph L. Whitaker as a named plaintiff. Mr. Whitaker, a former employee of another of the defendants' divisions, Deseret Industries, was employed as a truck driver by Industries from October 1977 until March 1983, when he was fired for failure to satisfy the worthiness requirement.

**B. Current Motions**

At issue in plaintiffs' motion for summary judgment is the application of the three-prong test to the activity of Beehive Clothing Mills, and to the activity of Deseret Industries. If the court determines that summary judgment is appropriate, it must determine whether the facts demonstrate that the activities at issue are religious in nature. The question of whether defendants violated Title VII when they terminated the plaintiffs from their employment will follow, of course, from the determination of the secular or religious nature of the activities.

The court must also determine the appropriate remedy for the unlawful employment discrimination of plaintiff Mayson as well as for other plaintiffs if it determines that other unlawful employment discrimination has occurred. Plaintiffs contend that they are entitled under Title VII to back pay.

Finally, plaintiffs move for reconsideration of the dismissal of their fourth claim for relief. That claim asserted a cause of action for intentional infliction of emotional distress and for invasion of privacy. Plaintiffs also move for attorney's fees and costs as the prevailing parties under 42 U.S.C. § 2000e–5(k).

**II. Motion for Summary Judgment**

**A. Beehive—Application of three-prong test**

■ The court must ascertain whether any genuine issues of material fact exist which would make the rendering of summary judgment inappropriate. The defendants have opposed the motion for summary judgment on the grounds that factual disputes remain. Each party has listed its statement of facts pursuant to U.S.Dist.Ct., D.Utah Civ.R. 5(e). Defendants have identified a number of facts which they believe remain in dispute.

The court has considered carefully both parties' statements of facts and the depositions, affidavits and answers to interrogatories. From this review, the court concludes that several genuine issues of material fact remain which preclude summary judgment as to Beehive. Pursuant to Fed. R.Civ.P. 56(d), however, the court has sifted the issues and has determined which material facts remain at issue for trial. The court has determined that many of those claimed to be in dispute by the defendants are not material to the issue at

---

1. Adamson and Arriola who were also employees at Beehive were added as plaintiffs by stipulation of the parties on October 24, 1983.

2. The court stated that plaintiffs were entitled to conduct discovery in the following areas:
   (1) the manufacturing of garments prior to 1960 and any subsequent changes; (2) the distribution of garments prior to 1960 and any subsequent changes; (3) the tax exempt status of Beehive; (4) the past and current employees who were or are non-members of the Mormon Church; (5) Beehive's contracts, both past and current, with private commercial enterprises for the production of garments; and (6) current hiring practices of the defendants' garment and temple clothing manufacturing plants in Mexico and England. 594 F.Supp. at 803.

hand or are disputed by the defendants because the defendants seek to state legal conclusions as facts. In large measure, however, there is substantial agreement among the parties regarding many of the factual issues. The court therefore will state those facts which it has found established[3] as well as specify those narrow areas of factual dispute which remain for trial.[4]

### Factual Background

The Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints ("CPB") and the Corporation of the President of the Church of Jesus Christ of Latter-day Saints ("COP") are corporations soles organized pursuant to the laws of Utah, Utah Code Ann. § 16–7–1 to 11 (1973). The COP is the incorporation of the office of the President of the Church of Jesus Christ of Latter-day Saints ("the Mormon Church" or "the Church")[5] and the CPB is the incorporation of the office of the Presiding Bishop of the Mormon Church.[6] Beehive Clothing Mills ("Beehive") and Deseret Industries ("Industries") are unincorporated divisions of the Corporations.

Plaintiff Christine J. Amos ("Amos") was employed in the personnel department of Beehive from April 26, 1976 through August 25, 1982. 594 F.Supp. at 796. Judy L. Bawden ("Bawden") worked as a seam-

stress at Beehive from 1971 to April 28, 1982. *Id.* Deniece Kanon ("Kanon") was employed as a seamstress at Beehive from 1978 to May 14, 1982. *Id.* April Joyce Riding ("Riding") worked as a seamstress at Beehive from 1974 to May 28, 1982. *Id.* Plaintiff Ruth Arriola ("Arriola") was employed at Beehive from 1980 through September 22, 1982. Shelleen Adamson was employed at Beehive from 1980 through September 22, 1982.

The Mormon Church is a religious association with headquarters in Salt Lake City, Utah and with members in various parts of the world. Although the Church conducts a variety of activities as well as worship services in chapels and meeting-houses, certain ceremonies and activities are reserved for the Church's temples. The temples are used for worship, prayer, instruction, ordinances and ceremonies such as baptisms and marriages. Temples are open to only those members of the Church who have met the worthiness requirements and have been granted a temple recommend after a series of interviews with Church leaders.[7]

Among the beliefs of the Mormon Church is that a member must make covenants with God during the temple ordinances. Temple garments and temple clothing must be worn when those covenants are made.[8] Members of the Mormon Church are required to wear the garments

---

**3.** The court will recite those facts which are crucial to the issue at hand. The parties have agreed on additional facts which are not stated herein.

**4.** The court cites the source of particular factual findings only when the facts have been asserted as disputed or when the facts have been unclear. Although the court has not engaged in "fact finding" it has considered the general proposition that a deposition is more reliable than an affidavit. *See* 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 56.11(4) (2d ed. 1985).

**5.** The ecclesiastical leader of the Mormon Church is its President, who is recognized by Mormon members as a prophet, seer and revelator chosen by Jesus Christ. The President and his counselors constitute the First Presidency of the Mormon Church.

**6.** The First Presidency is assisted in administering the affairs of the Mormon Church by priesthood quorums and counsels which include the Presiding Bishopric. The Members of the First Presidency, Presiding Bishopric and the quorums constitute what the Mormon Church refers to as its "General Authorities". The General Authorities make all ecclesiastical, administrative and policy decisions in the Church.

**7.** Members are asked a variety of questions to determine if they live according to Mormon Church standards and support the Church's leadership.

**8.** Temple garments are a white undergarment which covers the body from the knee to the neck. Temple clothing consists of special ceremonial robes and head coverings worn during specific portions of the Temple ceremony.

throughout their lives once they have participated in the ceremonies and covenants. The garments are marked with symbols whose significance is known to those who have participated in temple ceremonies. The Church regards the marks on garments as perhaps their most sacred feature. Supp.Ans. 14. Garments are considered to be more sacred after they are marked. *Id.*

Beehive Clothing Mills manufactures temple clothing, garments and temple veils. Determining whether Beehive's activities are religious is, of course, the crux of the issue at hand.

In 1936, the Mormon Church set up an operation to manufacture garments called Deseret Clothing Factory. From 1938 to 1960, four commercial companies,[9] not owned by or affiliated with the Mormon Church, also manufactured garments in the United States under restrictive licenses from the Church. These licenses forbade sale to non-members, display, or advertising of the garment.

The four commercial companies performed all necessary steps in the manufacture of the garments prior to their being marked with the religious symbols. Marking was authorized to be done by the Mormon Church member who purchased the garment, by the Relief Society of the Church or by Church members assigned to be at the commercial companies to mark the garments. No religious requirement of any kind was imposed on any employee of the four commercial companies. Until 1965, garments were distributed through the Mormon Church and also through certain department stores under restrictive licenses which forbade sale to non-members and prohibited display or advertising of garments.

When Beehive took over the manufacturing operations of the commercial companies in 1960, it continued to employ a number of the companies' employees. Among them were some who were not eligible for a temple recommend, ("ineligible members") and some who were not members of the Mormon Church. Supplemental Answers to Plaintiffs' Third Set of Interrogatories and Second Request for Production of Documents, December 14, 1984 ("Supp.Ans.") No. 8. At least some of the non-members or ineligible member employees were retained by agreement under an arrangement with the companies. Deposition of Harold Goldthorpe, January 18, 1985 ("Goldthorpe Depo.") at 190. From 1960 until at least 1983, Beehive has employed a few non-members and some members ineligible to receive a temple recommend. Affidavit of John Russell Homer, April 12, 1985, ("Homer Affidavit") Paragraph 5. Non-Mormon employees and members of the Church who were ineligible for a temple recommend have performed a variety of tasks at Beehive, including cutting, sewing and marking garments, packing and shipping garments and temple clothing. Supp.Ans. Exhibit ("Ex.") 15, Goldthorpe Depo at 82–92. Supp.Ans. No. 27 & Ex. 18.

In 1980 and 1981, Beehive contracted on a job lot basis with a number of commercial companies in Utah and Arizona as it could not meet the immediate demand for garments created when a new design of garment was introduced. Supp.Ans. No. 24; Goldthorpe Depo. at 71. Under its arrangement with these commercial manufacturers, cutting, marking, packaging, and distribution were done at Beehive. The commercial companies did the sewing of the pre-cut pieces. No religious requirement of any kind was imposed on any of these commercial companies' employees.

At present, three commercial companies outside of the United States, not owned by or affiliated with the Mormon Church, also produce garments. They are Jockey, Inc., in the Phillipines, I–Way Manufacturing in the United Kingdom, and Canterbury Manufacturing in New Zealand. I–Way Manu-

---

9. The companies were Lady Gay Manufacturing, Salt Lake Knitting Works, Ogden Knitting Works and Security Knitting Works. In addition to garments, Lady Gay Manufacturing man-ufactured other types of clothing of no religious significance for other customers. The other three commercial companies manufactured only garments.

facturing has been producing garments since 1979, Jockey, Inc. has been producing garments since 1984, and Canterbury Manufacturing has been engaged since approximately 1982. Supp.Ans. No. 24; Affidavit of Keith B. McMullin, April 11, 1985 ("McMullin Affidavit") paragraph 15. In each case, the commercial company cuts, and sews the garment up to the marking stage. Marking, packaging, and distribution are done by the Mormon Church. Supp.Ans. No. 24. No religious requirement of any kind is imposed upon the employees of these foreign companies who cut and sew garments. Recently, the Mormon Church has contracted with companies in Taiwan and Korea to manufacture garments. McMullin Affidavit, paragraph 14.

Beehive is an unincorporated division of the Materials Management Department of the Mormon Church. Its daily operations are supervised by a general manager who reports to the managing director of the Materials Management Department. Beehive operates under the direction of a special Church committee composed of General Authorities,[10] department and division management representatives and other Church leaders. Employees of Beehive are paid by the Mormon Church through the COP. Beehive's facilities are owned by the Mormon Church through the CPB.

Beehive's banking and accounting are handled through the Mormon Church. Beehive sells the garments and temple clothing it manufactures to members at no profit. The religious veils made at Beehive are used exclusively in temples and are not sold. Beehive's general operations are regularly subsidized by the Mormon Church from its general funds. Beehive's operation and facilities are tax exempt. The general authorities of the Mormon Church must approve changes in the way garments and temple clothing are manufactured and must approve who manufactures the garments.

Amos worked as an employee service aide, a personnel assistant, for Beehive from August 30, 1979 to August 25, 1982.

As part of her duties, she interviewed job applicants and oriented new hires to the terms of employment at Beehive. She also processed insurance, retirement, tax and payroll forms. She did not make hiring or firing decisions.

In August 1979, when Amos was being trained, she was told by the Personnel Manager of Beehive that job applicants did not have to be active in the Mormon Church to be hired. Amos was instructed only to ask if an applicant was a baptized member of the Mormon Church and if he or she observed certain dietary and health laws of the Mormon Church, called the Word of Wisdom.

The employment policy of Beehive at the present time is administered by the Personnel Department of the Mormon Church. Prior to 1981, however, the Church's Personnel Department did not fully supervise the employment policies of Beehive. Homer Affidavit, paragraphs 3 and 4, Affidavit of Christine Amos, March 16, 1985, ("Amos Affidavit") paragraph 5. Prior to December 1981, the employment application at Beehive asked whether the applicant kept the standards of the Mormon Church. At least one applicant was hired who answered no to that question. Amos Affidavit, paragraph 5. Homer Affidavit, paragraphs 8 and 10. After December 1981, the employment application form contained a pledge to be signed by the applicant to live so as to be eligible to hold a temple recommend. Homer Affidavit, paragraph 8.

The Mormon Church adopted personnel policies and procedures in 1969 which stated that "continued employment in the Church is dependent on the employees living their lives so as to be worthy of a temple recommend." These policies were not strictly applied to Beehive until it came within the full administration of the Personnel Department after 1980. Homer Affidavit, paragraphs 3 and 4. Plaintiffs

**10.** *See supra,* note 3.

Amos, Kanon, and Riding were given copies of Beehive's personnel manual during their employment.[11] Each signed a statement indicating that she had read it. In the manual is included the following statement:

As Latter-day Saints we have certain standards that the First Presidency has asked us to abide by. All employees are expected to conform to the teachings of the Church of Jesus Christ of Latter-day Saints. Serious violations of these teachings will result in an employee being terminated.

Pursuant to directions from the Personnel Department, a review of various Church departments and division employees was begun in 1980 to determine compliance with Church personnel policy. Homer Affidavit, paragraph 6. A formal review to determine whether all employees at Beehive were worthy of a temple recommend was conducted in the Spring of 1982. Goldthorpe Depo. at 33. Homer Affidavit, paragraph 7. No such similar formal review had occurred in the preceeding ten years. Goldthorpe Depo. at 7, 33. The review was announced at a regularly scheduled Monday morning devotional meeting.[12]

During the 1982 review of the 399 employees at Beehive, plaintiffs Amos, Bawden, Kanon, Riding, Arriola and Adamson and 78 other employees were identified as employees who were not worthy of a temple recommend. Plaintiffs and thirteen other employees were terminated after refusing to complete or failing to complete satisfactorily a probationary period to become eligible members. Sixty-eight other employees who were found ineligible became eligible during their probationary period. Two employees who were former employees of the commercial companies were retained although they were not members.

Plaintiffs Bawden, Kanon, and Riding were employed as seamstresses. Plaintiff Arriola was employed as a cutter of temple clothing at the time of her termination. Adamson was employed as a cutter of garments. Amos was employed as an employee service aid. At no time did any of the plaintiff's positions of employment require any of them to describe, explain or proselytize the doctrine and beliefs of the Mormon Church. At no time did any of plaintiff's positions require any of them to engage in worship, ritual or ministerial duties of the Mormon Church nor in matters of Mormon Church administration.

*Factual Issues in Dispute or in Need of Development*

Both parties agree that step one of the three-prong test is not at issue here. Plaintiffs concede that the tie between Beehive and the Mormon Church in such areas as financial affairs, day-to-day operations and management is close and substantial.

Several factual issues remain to be clarified before the court can proceed to apply the three-prong test. Both parties agree that the jobs performed by the plaintiffs at Beehive do not in and of themselves involve worship, ritual or ministerial duties of the Mormon Church. Plaintiffs argue that because the individual jobs such as cutting or sewing the garments are not religious and because the Mormon Church has relied and currently relies on non-Mormon owned companies to manufacture garments, Beehive can not be considered a religious activity. Plaintiffs believe the facts indicate that there is no sincerely held religious belief or tenet that only members of the Mormon Church or those members who are eligible for a temple recommend can be employed manufacturing garments.

The defendants, however, insist that the facts indicate that they are moving toward direct production of all garments by Mormon Church-owned manufacturing facilities. They assert that Church control of the entire manufacturing process is necessary in order to shield the Church's sacred

---

**11.** Whether plaintiff Arriola received a copy of the manual is disputed.

**12.** Devotional services are held weekly at Beehive and all employees are encouraged to attend.

objects from ridicule by non-Mormons. They state that only eligible members are currently employed at Beehive. Past practices of allowing non-members or ineligible members to be employed were necessitated by the Church's agreements with the companies they took over or by necessity when a sudden demand for new styled garments temporarily overwhelmed Beehive's capabilities.

Defendants also contend that the manner of supplying garments to Church members outside of the United States is not relevant to the issue at hand. They state that even if foreign garment operations are pertinent, requirements that workers abroad be temple worthy and that companies be owned and controlled by the Mormon Church is not feasible. Defendants cite four major reasons for not imposing Church membership requirements similar to those imposed on United States employees on those who manufacture garments abroad. They are: (1) government restrictions preclude import; (2) local laws do not recognize religious preference; (3) volumes do not justify the high costs of the creation of Church facilities and; (4) there are insufficient numbers of skilled Church members capable of being employed. McMullin Affidavit, paragraph 13.

In summary, defendants assert that Beehive and the plaintiffs' jobs are religious activities because garments and temple clothing are an essential element of temple worship. The manufacturing of garments and temple clothing is a "religious necessity and its achievement can only be held to be a religious activity." Defendants' Memorandum in Opposition to Motion for Summary Judgment at 69.

Plaintiffs contest not only defendants' conclusion but also the consistency of defendants' asserted belief that only eligible members can manufacture temple wear. They dispute that there are laws which do not recognize religious preference in employment in any countries where garments are being manufactured by commercial firms. They point to the testimony of Harold Goldthorpe, manager of the International Materials Management division of the Mormon Church, which they believe suggests that there are no such laws. *See* Goldthorpe Depo. at 109–110, 113. Plaintiffs also assert that Beehive's history of employing ineligible and non-member employees until 1983 indicates that the manufacturing of garments is not a religious activity. Plaintiffs note, for example, that between 1973 and 1983, the Mormon Church produced garments at its own facility in England. Goldthorpe Depo. at 54–56. It now contracts with a non-Mormon commercial company in England, I–Way Manufacturing, to manufacture garments.

The court believes two narrow but significant factual areas remain in dispute or are unclear in the record. Evidence needs to be presented in court to resolve them before summary judgment is appropriate. The first area involves Beehive's hiring practices regarding applicants who answered "no" to the question of whether they kept the standards of the Church. The plaintiffs claim that several applicants were hired who answered "no." The defendants assert that only one was hired. Evidence should be presented regarding the numbers of such individuals hired and the circumstances, if any, prompting the hiring of non-members or ineligible members.

The second area of factual dispute that necessitates a hearing involves the defendants' contention that circumstances exist that preclude the manufacture abroad of garments and clothing by Mormon owned companies or eligible Mormon Church members. The defendants have asserted in the affidavit of McMullin that certain factors abroad hinder or prevent the imposition of religiously based employment practices in other countries.

The following facts need to be determined regarding the manufacture of temple garments and clothing for each foreign situation:

1. What specific laws are in existence that relate to the issue of religious preference in hiring? How do they impact the manufacture of garments?

2. What are the specific laws or regulations that preclude import of garments?

3. What is the volume of garments manufactured in the country? What is the cost per garment or unit and how does that impact upon the manufacture of garments?

4. What are other critical factors associated with the manufacture of garments that result in their manufacture by commercial companies rather than by a Mormon-owned facility or individual Mormon seamstresses?

Despite the defendants' contention that the facts surrounding the foreign manufacture of garments is not critical to the resolution of American constitutional rights, the court believes otherwise. The Mormon Church asserts that the manufacture of garments and temple clothing is a religious activity. If it believes that the manufacture of garments should be done by Mormons if at all possible, then the manufacture of garments throughout the world should be reflective of that belief. Practices resting "solely upon considerations of policy, pragmatism, or expediency", *Welsh v. United States*, 398 U.S. 333, 342–43, 90 S.Ct. 1792, 1797–98, 26 L.Ed.2d 308 (1970) (plurality opinion of Black, J.) will not support a finding that they are religiously motivated.

**B. Deseret Industries**

■ Although defendants have not made a motion for summary judgment in their favor, the court can find no genuine issue of material fact regarding Deseret Industries. Each parties' statement of facts pursuant to U.S.Dist.Ct., D.Utah Civ.R. 5(e) is similar. Defendants have listed additional facts regarding the relationship between Deseret Industries and the Mormon Church which the plaintiffs have not disputed.

The court has considered carefully both parties' statements of facts as well as the depositions, answers to interrogatories and affidavits and concludes that summary judgment is appropriate under the standards of Fed.Rule Civ.P. 56. No genuine issues of material fact exist and the court can rule as a matter of law.

Although defendants have not filed a cross-motion for summary judgment, the court nonetheless grants summary judgment in their favor. This is appropriate where there is no genuine issue of material fact and, on the established facts, the principles of substantive law warrant judgment in their favor. *See* 6 (Part 2) James Moore and Jeremy Wicker, *Moore's Federal Practice* ¶ 56.15(8).

*Factual Background*

Deseret Industries ("Industries") is a division of the Mormon Church's Welfare Services Department. Deseret Industries operates a number of thrift stores throughout Utah which sell used clothing and refurbished goods to the general public. In doing so, Industries provides employment and training to handicapped and mentally retarded persons through a federally certified sheltered workshop program. Deseret Industries also provides jobs for people who are unable to find other remunerative work.

These handicapped and previously unemployed employees are employed on the basis of a referral from a Mormon bishop and are therefore categorized by Deseret Industries as "client referrals." The client referrals refurbish donated goods as well as perform tasks related to the contracting work which Deseret Industries undertakes from time to time for outside companies, such as sorting or performing routine assembly tasks.

Deseret Industries also employs "staff" employees. While staff employees are frequently managers, supervisors, or trainers, staff employees may perform tasks with less supervisory responsibilities. Some positions, such as that of a repairman, for example, may be occupied by either a staff or a client referral employees.

All of the staff employees of Deseret Industries are required to be eligible Church members. A very high percentage of the client referral employees are also Mormon Church members. A client refer-

ral becomes employed when the individual's biship [13] refers that person to Industries to see if training or employment can be made available. Non-Church member referrals are occasionally made when that referral is a part of the assistance given to the non-member's family who are Church members.

Deseret Industries solicits used goods and customers from the general public through public advertisements. In addition to revenues generated by the sale of refurbished goods and contracted services, Deseret Industries is regularly subsidized by the Mormon Church and by fast offerings [14] contributed by Church members. Industries' operations are exempt from federal and state taxes. Bishops of the Mormon Church have authority to requisition from Deseret Industries items necessary to meet the needs of needy members of the Mormon Church at no cost to the recipient. All employees at Deseret Industries are encouraged to attend one of several Mormon devotional services held daily at each facility.

Plaintiff Whitaker was employed as a truck driver at a Deseret Industries store in October, 1977, pursuant to a referral from his Mormon bishop. In November, 1977, he was excommunicated from the Mormon Church; a fact of which the manager of the Deseret Industries store was aware. Whitaker was considered to be a good worker, however, and was retained as a truck driver. He also supervised a handicapped trainee. Sometime between 1982 and 1983, the status of Whitaker's position was changed from a referral to a staff position. In early 1983, Whitaker was informed that because he could not be worthy of a temple recommend, he would be terminated and he was accordingly fired on March 15, 1983.

Whitaker's job as a truck driver did not require him to describe, explain or proselytize the doctrines and beliefs of the Mormon Church nor to engage in worship or ritual. Except for his responsibilities as the trainer of a handicapped individual, his job did not involve other supervisory responsibilities.

When Whitaker was referred to Deseret Industries in 1977, he completed and signed an employment application which included a paragraph stating that he would adhere to Mormon Church standards.

### Discussion

It is clear from the facts that religion was the key factor in Whitaker's discharge. The task before the court is to determine whether Deseret Industries' activities are religious in nature. If they are, Deseret Industries is permitted to discriminate on the basis of religion both under the free exercise clause of the First Amendment and pursuant to the exemption provided by section 702 of Title VII. If Deseret Industries' activities are secular, however, it can not rely on the exemption provided under section 702 because of this court's decision in Amos I.

The legal standards for examining whether Deseret Industries' activities are religious have been set forth in Amos I in the three-prong test. 594 F.Supp. at 799. That test has been stated in full above. Both parties agree that step one of the test is not at issue in the present case. The tie between Deseret Industries and the Mormon Church with regard to areas such as financial affairs, day-to-day operations and management is a close and substantial one. Deseret Industries was established by the Mormon Church and is a part of the Mormon Welfare Services Department. Deseret Industries' operations and facilities are subsidized by the fast offerings of Church members and by general Church funds. Deseret Industries is managed by a gener-

---

**13.** A bishop is the church or "priesthood" leader with responsibilities over the local "ward" of the Mormon Church. A bishop is chosen or approved in his position by the General Authorities of the Church.

**14.** Mormon doctrine requires each faithful member to fast for a period of time each month and contribute the savings to the Mormon Church. The Church uses the funds to assist the needy through a variety of programs including Deseret Industries.

al manager who in turn reports to a governing board. That governing board is composed of General Authorities, members of the General Boards of Church ladies' and mens' auxiliary organizations and other priesthood leaders.

The dispute between the parties is focused on the second step of the test outlined in Amos I. That prong requires the court to "examine the nexus between the primary function of the activity in question and the religious rituals or tenets of the religious organization or matter of Church administration." 594 F.Supp. at 799. The court concludes that the nexus between the primary function of Deseret Industries and the religious tenets of the Mormon Church is close and substantial. Accordingly, Deseret Industries is a religious activity and the Mormon Church may determine religious qualifications for Deseret Industries' employees.

■ In Amos I, this court rejected the plaintiffs' contention that the court should focus only on the type of jobs that the plaintiffs were performing and not on the general nature of the entities involved. 594 F.Supp. at 798. Instead, the court developed a more comprehensive approach. The three-prong test includes an analysis of the general nature of the activity in relation to the religious tenets of the organization, its relationship administratively to the religious organization and an analysis of the individual job in question. Prong two which examines the primary function of the activity in relationship to the religious beliefs of the religious organization, requires a much broader view of the activity in question than simply an examination of the individual's job. An examination of the function of an activity necessarily implies a consideration of the activity's purpose that it serves or the particular kind of work it is intended to perform. *See Webster's New Collegiate Dictionary*, (1979). That definite end or purpose must be measured against the religious rituals or tenets of the organization or against matters of Church administration. There must be a substantial connection between the two to satisfy the second prong.

The present-day Welfare System of the Mormon Church, of which Deseret Industries is a part, was established in 1936. At that time, the president of the Church stated the primary purpose of the welfare plan to be:

> to set up, in so far as it might be possible, a system under which the curse of idleness would be done away with, the evils of a dole abolished, and independence, industry, thrift and self respect be once more established among our people. The aim of the Church is to help the people to help themselves. Work is to be reenthroned as the ruling principle of the lives of our Church membership.

Heber J. Grant, Conference Report, October 1936, p. 3, *quoted in Welfare Services Resource Handbook*.

The founder and prophet of the Mormon Church, Joseph Smith, stressed the importance of welfare work in Mormon beliefs. He stated:

> You must continue to bear in mind that the temporal and the spiritual are blended. They are not separate. One cannot be carried on without the other, so long as we are here in mortality.
>
> The Latter-day Saints believe not only in the gospel of spiritual salvation.... We do not feel that it is possible for men to be really good and faithful Christian people unless they can also be good, faithful, honest and industrious people. Therefore, we preach the gospel of industry, the gospel of economy, the gospel of sobriety.

Gospel Doctrine, Deseret Book Company, p. 208. (*quoted in Welfare Services Resource Handbook*, p. 4.)

Various passages of Mormon scripture also indicate the importance the religion places on charity and work. *The Book of Mormon*, Moroni 7:47 states that "charity is the pure love of Christ, and it endureth forever; and whoso is found possessed of it at the last day, it shall be well with him." The *Doctrine and Covenants* (Section 52:40) requires that the Mormon Church

and its members "remember in all things the poor and the needy, the sick and the afflicted, for he that doeth not these things, the same is not my disciple."

The Welfare System of the Mormon Church is multifaceted. The Church operates a system of bishops' storehouses to provide commodities and work opportunities at the local level. Local wards and stakes are encouraged to undertake and develop projects which will produce goods for the welfare system including goods for the bishops' storehouses. These projects can take the form of working farms and manufacturing plants. The Church also operates employment centers and social welfare services for use by Church members. As part of its teachings on self-sufficiency, the Mormon Church urges members to store a year's supply of food, clothing and fuel. *See Welfare Services Resource Handbook.*

The *Welfare Services Resource Handbook* (*"Handbook"*) produced for local Church leaders states that "the ultimate aim of welfare services' principles, programs, and activities is to develop Christ-like character in Church members, thus preparing them to live in a society where men and women are of 'one heart and one mind,' where they live in 'righteousness' and there are 'no poor among them'." *Handbook* at 1. The 1985 Priesthood Manual distributed to all men in the Mormon Church states: "As we willingly accept welfare assignments and give a generous fast offering, we play a vital part in the Lord's work. As we offer both our time and our means, we develop "the pure love of Christ" (Moronia 7:47) and thus qualify to "become the sons of God" (Moroni 7:48). *See* Affidavit of Glen Pace, April 12, 1985, paragraphs 3 and 4.

Deseret Industries is a part of the Mormon Church's welfare services program. The specific objectives of Deseret Industries are set forth in the *Handbook.* The objectives are to:

(1) provide meaningful employment and work training within the storehouse resource system, insofar as it is possible, for those who cannot otherwise obtain employment. This includes rehabilitating some needy members by providing work and training in an environment which will enable them to become self-sustaining;

(2) produce quality items for use by bishops, and low cost items for sale to the public;

(3) provide opportunities for individuals to share their means and talents with those who need such help;

(4) provide a means whereby goods can be recycled or renovated, thus avoiding waste.

Plaintiffs contend that these objectives of Deseret Industries indicate that it is not a religious activity. They concede that all the activities of Deseret Industries are motivated by the Mormon Church's belief in charity and rendering assistance to the needy. Plaintiffs assert, however, that religious motivation alone is not sufficient to make an activity religious.

Plaintiffs draw the court's attention to *Denver Post of the Nat'l Socy of the Volunteers of America v. N.L.R.B.*, 732 F.2d 769 (10th Cir.1984). In that case, the court rejected a finding that the VOA's charitable operations were religious.[15] In reaching its finding, the court focused on the nature of the activities of the VOA programs. It found that although the VOA claimed its programs were an expression of its religious philosophy, it was not clear that religion played a central role in them. The court noted that the VOA did not require the staff to have any particular religious background nor were religious activities conducted at the program's facilities. Moreover, many of the programs' employees were unaware of the VOA's religious missions. The court concluded that the VOA's programs "function in essentially a

---

**15.** The VOA operated social programs in Denver which included "facilities that provided temporary shelter, care, and counseling for women and children." *Denver Post of VOA,* 732 F.2d at 770.

secular fashion." *Denver Post of VOA,* 732 F.2d at 772.

Plaintiffs assert that Deseret Industries also operates in a secular fashion. They note that the program solicits used goods from the public at large and that its stores are open to all. Deseret Industries advertises to the general public and its advertisements do not refer to Industries' religious nature. In addition, plaintiffs assert that its employees are not involved in proselytizing or advocating the Mormon religion.

The court, however, finds that there are significant differences between the functioning of the VOA programs in *VOA supra,* and Deseret Industries. Deseret Industries' employees are for the most part, Church members and have been since its inception. All staff and management positions are filled by Church members. All client referral employees are employed only after a Mormon Church bishop has made the referral. Non-Church members are hired only if referred by a Mormon Church bishop. Although Deseret Industries operates sheltered workshops, those who are employed there are almost exclusively Church members. Industries does not provide employment for the public at large.

The thrift shops also serve Church needs. The bishops of the Mormon Church as ecclessiastical leaders at the local neighborhood level have the ability to requisition goods at no cost from Deseret Industries for Church members in need. Deseret Industries does not similarly give away its goods to members of the general public. The fact that it offers refurbished goods to the public at low cost does not necessarily mean that the organization is functioning in a secular fashion. "A religious activity of a religious organization does not lose that special status merely because it holds some interest for persons not members of the faith, or occupies a position of respect in the secular world at large." *Feldstein v. Christian Science Monitor,* 555 F.Supp. 974, 976 (D.Mass.1983).

All employees of Deseret Industries are aware of its relationship with the Mormon Church. Daily devotional services are held on the premises. In addition, Deseret Industries is dependent on the Mormon Church for its financial support.

Plaintiffs contend that the approach used by the Tenth Circuit in *VOA,* however, focuses solely on the nature of the activities in question and disregards religious motivation if the particular activities do not appear to be overtly religious. More particularly, plaintiffs suggest that only those activities which obviously involve the propogation of religion or the performance of religious worship can be considered to be religious. That characterization of the court's reasoning in *VOA,* however, is incomplete. It is true that with respect to the religious nature of Deseret Industries, the court must consider "the activity at issue by reference to objectively ascertainable facts concerning their nature and scope." *See Tony and Susan Alamo Foundation v. Secretary of Labor,* —— U.S. ——, 105 S.Ct. 1953, 1960–61, 85 L.Ed.2d 278 (1985). But that does not mean that the court must ignore an inquiry into the belief system that informs the particular actions in question. Implicit in the court's analysis in *VOA* and critical to the second prong of the Amos I test is the *relationship* between the objectively identifiable activities of the organization and its religious beliefs and tenets (or matters of Church administration). That relationship must be close and substantial in order for the organization to meet the second prong of the test. Moreover, even if the relationship under prong two is close and substantial, there must also be either a close tie between the activity in question and the administrative day-to-day functionings of the religious beliefs or tenets to render the activity "religious."

Under the three-prong test of Amos I and Supreme Court pronouncements, an organization's activities need not be limited strictly to propagation or advocation of religious beliefs to be found religious. Such a restricted view of what is "religious" would drastically curtail the scope of protection provided by the first amendment. Religious beliefs may dictate

a wide range of conduct beyond simply that involved in proselytization or worship. Determining whether or not adherence to a particular philosophy constitutes a religious belief entitled to constitutional protection is "more often than not a difficult and delicate task." *Thomas v. Review Board of Indiana Employment Sec. Div.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981). Whether a belief is religious does not depend on whether the belief is true or false, *United States v. Ballard*, 322 U.S. 78, 86–88, 64 S.Ct. 882, 886–87, 88 L.Ed. 1148 (1944) or whether the belief is "acceptable, logical, consistent, or comprehensible to others …" *Thomas*, 450 U.S. at 714, 101 S.Ct. at 1430. The religious nature of a belief depends on whether the belief is based on a theory "of mans nature or his place in the Universe," *Founding Church of Scientology v. United States*, 409 F.2d 1146, 1160, (D.C.Cir. 1969) *cert. denied*, 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969) or represents "[A] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God" of orthodox believers. *United States v. Seeger*, 380 U.S. 163, 176, 85 S.Ct. 850, 859, 13 L.Ed.2d 733 (1965). A religious belief must be sincerely held. *United States v. Seeger*, 380 U.S. at 185, 85 S.Ct. at 863–64; *Theriault v. Carlson*, 495 F.2d 390, 394 (5th Cir.1974), *cert. denied*, 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974). Religious beliefs may have their source in scripture or tradition, revelation or meditation. They may be institutionalized or "be of a recent vintage or formed instantaneously." *Brown v. Dade Christian Schools*, 556 F.2d 310, at 313 (5th Cir.1977) *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978). "Religion" must be defined broadly to secure protections guaranteed in the first amendment's free exercise clause. *See* Note, "Toward a Constitutional Definition of Religion," 91 *Harvard L.Rev.* 105 (1978). In such an intensely personal mat-

ter, the claimant's assertion "that his belief is an essential part of a religious faith must be given great weight." *United States v. Seeger*, 380 U.S. 163, 184, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1964).

The close ties that exist between the function of Deseret Industries and the religious tenets and beliefs of the Mormon Church are inescapable. Deseret Industries was founded by the Mormon Church. It functions to provide both meaningful employment and training to Mormon Church members as well to provide the resources for bishops to utilize when helping needy Church members. It is clear from the record that the Mormon Church believes in providing charity to its members and believes that spiritual well-being and temporal well-being go hand in hand. The *raison d'etre* of Deseret Industries is to carry out the Mormon Church's aim to help members help themselves and in so doing to fulfill the admonition of its founder, Joseph Smith, to "develop the pure love of Christ." The court finds that Deseret Industries is a religious activity as there is an intimate connection between Industries and the defendants and the Mormon Church and between the primary function of Industries and the religious tenets of the Church. The court does not need, therefore, to consider the third step of the test.

### III. *Title VII Remedies—Backpay*

The only plaintiff presently entitled to a remedy under Title VII is Frank Mayson. Because of this court's decision in Amos I, it is clear that defendants unlawfully discriminated against Mayson when they terminated his employment from Deseret Gymnasium on religious grounds. Plaintiff urges that he be awarded backpay with interest from the date of his firing plus contributions to his pension and that he be reinstated to his former position.

Awarding backpay under Title VII, as provided in 42 U.S.C. § 2000e–5,[16] is not mandatory. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415, 95 S.Ct. 2362,

---

**16.** 42 U.S.C. § 2000e–5 states:
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice

charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropri-

2370, 45 L.Ed.2d 280 (1975). In determining whether backpay is appropriate, the district court must exercise its discretion in order to further the twin statutory goals of "eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle*, 422 U.S. at 421, 95 S.Ct. at 2373. *See also United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 931 (10th Cir.1979). (Back pay is an "effort to make the aggrieved persons whole insofar as possible ..."). In spite of the equitable nature of the remedy, however, the Supreme Court has stressed that there is a strong presumption in favor of a backpay award. *Albemarle*, 422 U.S. at 421, 95 S.Ct. at 2373; *City of Los Angeles, Department of Water and Power v. Manhart*, 435 U.S. 702, 723, 98 S.Ct. 1370, 1383, 55 L.Ed.2d 657 (1978). The fact that an employer's breach has not been made in bad faith is an insufficient reason for denying backpay because "Title VII is not concerned with the employer's good intent".... Rather, the thrust of Title VII is directed " 'to the *consequences* of employment practices, not simply the motivation.' " *Albemarle*, 422 U.S. at 422, 95 S.Ct. at 2374, quoting *Griggs v. Duke Power Co.*, 401 U.S. 424 at 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (emphasis in the original).

Defendants argue that it would be unfair for the court to grant retroactive relief in this situation. They contend that they relied justifiably on the plain language of the exemption provided by section 702 when they imposed their employment standards. Defendants make the legitimate argument that legislative acts are presumed to be constitutional and no court until now has directly confronted the constitutional issues posed by that exemption.[17]

Defendants rely on *City of Los Angeles v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) to support their conten-

tion that it would be unjust for this court to award backpay under these rather unique circumstances. In *Manhart*, the employer withheld more from its female employees' checks for pension contributions than from its male employees because women as a class live longer than men. Although the Court held that this practice violated Title VII, it did not uphold the awarding of backpay. It recognized that the administrators of the pension plan may well have assumed their requirements were lawful. The Court reasoned that the deterrent effect of imposing backpay would be unnecessary in that situation, while its imposition could threaten the solvency of the overall plan. The Court in *Manhart* stressed, however, that their decision "did not qualify the force of the *Albemarle* presumption" in favor of backpay. *Manhart*, 435 U.S. at 723, 98 S.Ct. at 1383.

This court has considered carefully the *Manhart* decision and finds the considerations presented there which argued against backpay are not so strongly present here. The court acknowledges the forcefulness of the defendants' argument and finds the decision on backpay to be a close one. Nonetheless, on careful reflection upon the objectives of Title VII, the court concludes that retroactive relief is appropriate here. It is true that the denial of backpay in this instance would probably not "frustrate the central statutory purpose of eradicating discrimination throughout the economy." *See Albemarle*, 422 U.S. at 421, 95 S.Ct. at 2373. But the denial of backpay would frustrate the Act's purpose of making Frank Mayson whole for his injuries incurred through Deseret's past discrimination. Mayson's termination from employment at Deseret resulted in a substantial pay cut and impacted negatively upon his prospective pension benefits. The thrust of the remedial actions of the court must be directed at the employment practices' consequences, not at their motivation. *Al-*

---

ate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ...

**17.** This court's holding was foreshadowed by discussions in *King's Garden, Inc. v. F.C.C.*, 498 F.2d 51 (D.C.Cir.), *cert. denied*, 419 U.S. 996, 95

S.Ct. 309, 42 L.Ed.2d 469 (1974) and *Feldstein v. Christian Science Monitor*, 555 F.Supp. 974, 978–79 (D.Mass., 1983). This does not mean, however, that defendants were not justified in relying on the section 702 exemption.

*bemarle,* 422 U.S. at 422, 95 S.Ct. at 2373–74. The statutory directive to make the employee whole tips the equities in favor of the awarding of retroactive relief.[18]

Accordingly, Frank Mayson is entitled to an award of backpay representing the difference between what he has earned subsequent to his termination on April 10, 1981 through the date of this order and what he would have earned if he had not been fired. This figure must include an estimate of the annual increases that Mayson would reasonably have received as well as compensation for lost vacation time (the difference in vacation days provided by Deseret and his subsequent employers). Defendants must also contribute the appropriate annual amounts to Mayson's pension account from April 10, 1981. *U.S. v. Lee Way Motor Freight, Inc.,* 625 F.2d 918 (10th Cir.1979). Mayson is also entitled to prejudgment interest on his award of backpay calculated pursuant to the adjusted prime rate of the Internal Revenue Service. A number of courts have applied the § 6621 of the Internal Revenue Code rate of interest to backpay awards. *See, e.g. Ass'n. Against Discrimination v. City of Bridgeport,* 572 F.Supp. 494–95 (D.Conn. 1983) and cases listed therein.

The specific amount of Mayson's award cannot be stated by the court at this time. Although plaintiffs have submitted detailed facts regarding the amount of Mayson's total adjusted lost earnings as of May 17, 1985, defendants have not. It is hoped that the parties can stipulate to the award based on the court's statements above. If there is a need for an evidentiary hearing to be held to determine the amount of backpay award, the parties should request a hearing.

Plaintiff Mayson has also requested that he be reinstated at Deseret. That remedy is within the discretion of the court pursuant to 42 U.S.C. § 2000e–5(g). Defendants have not opposed Mayson's reinstatement.

Accordingly, the court orders that Mayson be reinstated.

## IV. *Reconsideration of Dismissal of Plaintiffs' Fourth Claim for Relief*

Plaintiffs have moved for reconsideration of the court's dismissal in Amos I of their claim for intentional infliction of emotional distress. The plaintiffs' motion is based on the addition of allegations made in their amended complaint.[19] Plaintiffs now also claim that the allegations state a cause of action for invasion of privacy.

Plaintiffs' allegations are set forth in Amos I, 594 F.Supp. at 830. In addition, plaintiffs now allege:

The manner in which the CORPORATIONS imposed the worthiness requirement on plaintiffs and thereafter fired plaintiffs due to their inability or unwillingness to satisfy that requirement was highly public and calculated to subject plaintiffs to humiliation and scorn from their fellow employees.

(Amended Complaint, paragraph 53). Plaintiffs have submitted the affidavits of Amos, Kanon and Mayson in support of their new allegations. Defendants have moved to strike those affidavits on the basis that the affidavits do not support a finding that the affiants have personal knowledge of the matters in their affidavits. It is the opinion of the court that the affidavits should be considered and defendants' motion to strike should be denied. However, considering the averments of both the affidavits and the fourth claim for relief of the amended complaint, the court finds as a matter of law that they do not state that level of "outrageous and intolerable" conduct contemplated by the Utah Supreme Court. *See* 594 F.Supp. 830–31. The court also finds as a matter of law that they do not state a claim for invasion of privacy. *See Restatement (2d) of Torts* § 625D comments a and c (1977). Thus, the plaintiffs' motion for reconsideration is denied.

---

**18.** The court does not believe that the exemption from backpay provided by section 713 of Title VII, 42 U.S.C. § 2000e–12 is applicable here. That narrow exemption pertains to an employment practice in good faith conformity with and reliance upon a written opinion of the Equal Employment Opportunity Commission.

**19.** Plaintiffs were granted leave to amend after the court ruled in Amos I.

### V. *Attorney's Fees*

The court reserves the question of attorney's fees until all matters in this case are concluded.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiffs' motion for summary judgment regarding Beehive Clothing Mills is denied as genuine issues of material fact remain;

2. Plaintiff's motion for summary judgment regarding Deseret Industries is denied. The court grants summary judgment in favor of defendants.

3. Plaintiff Mayson is granted backpay with interest and fringe benefits and is ordered to be reinstated at Deseret Gymnasium.

4. Defendants' motion to strike is denied and plaintiffs' motion for reconsideration of the dismissal of plaintiffs' fourth claim for relief is also denied.

5. Plaintiffs' motion for attorney's fees and costs is reserved until the conclusion of the trial in this case.