# CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS ET AL. *v.* AMOS ET AL.

No. 86–179.   Argued March 31, 1987—Decided June 24, 1987*

*Together with No. 86–401, *United States* v. *Amos et al.*, also on appeal from the same court.

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and POWELL, STEVENS, and SCALIA, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 340. BLACKMUN, J., *post*, p. 346, and O'CONNOR, J., *post*, p. 346, filed opinions concurring in the judgment.

*Rex E. Lee* argued the cause for appellants in No. 86–179. With him on the briefs were *Wilford W. Kirton, Jr., Dan S. Bushnell, M. Karlynn Hinman, Benjamin W. Heineman, Jr., Carter G. Phillips,* and *Ronald S. Flagg. Assistant Attorney General Reynolds* argued the cause for the United States in No. 86–401. With him on the briefs were *Solicitor General Fried, Deputy Solicitor General Ayer, Deputy Assistant Attorney General Carvin,* and *Andrew J. Pincus.*

*David B. Watkiss* argued the cause for appellees in both cases. With him on the brief were *Elizabeth T. Dunning, John A. Powell, Joan E. Bertin,* and *John E. Harvey.*†

JUSTICE WHITE delivered the opinion of the Court.

Section 702 of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 42 U. S. C. § 2000e–1, exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion.[1] The question pre-

---

†Briefs of *amici curiae* urging reversal were filed for the American Association of Presidents of Independent Colleges and Universities et al. by *Edward McGlynn Gaffney, Jr.;* for the American Jewish Congress by *Marc D. Stern* and *Amy Adelson;* for the Baptist Joint Committee on Public Affairs by *Donald R. Brewer* and *Oliver S. Thomas;* for the Catholic League for Religious and Civil Rights by *Steven Frederick McDowell;* for the Christian Legal Society et al. by *Michael W. McConnell, Michael J. Woodruff, Samuel E. Ericsson, Kimberlee W. Colby, Philip E. Draheim,* and *Forest D. Montgomery;* for the General Conference of Seventh-day Adventists by *Warren L. Johns, Walter E. Carson,* and *Melvin B. Sabey;* for the National Jewish Commission on Law and Public Affairs by *Nathan Lewin* and *Dennis Rapps;* for the United States Catholic Conference by *John A. Liekweg* and *Mark E. Chopko;* and for the Council on Religious Freedom by *Lee Boothby, James M. Parker, Robert W. Nixon,* and *Rolland Truman.*

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations et al. by *Michael H. Gottesman, Robert M. Weinberg, David M. Silberman,* and *Laurence Gold;* for the Anti-Defamation League of B'nai B'rith by *Harold P. Weinberger, Justin J. Finger, Jeffrey P. Sinensky, Jill L. Kahn, Ruti G. Tietel,* and *Meyer Eisenberg;* for the Employment Law Center of the Legal Aid Society of San Francisco by *Joan M. Graff, Robert Barnes,* and *Robert E. Borton;* and for the Women's Legal Defense Fund et al. by *Donna Lenhoff.*

*Jordan W. Lorence* filed a brief for Concerned Women of America as *amicus curiae.*

[1] Section 702 provides in relevant part:

"This subchapter [i. e., Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*] shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment

sented is whether applying the § 702 exemption to the secular nonprofit activities of religious organizations violates the Establishment Clause of the First Amendment. The District Court held that it does, and these cases are here on direct appeal pursuant to 28 U. S. C. § 1252.[2] We reverse.

## I

The Deseret Gymnasium (Gymnasium) in Salt Lake City, Utah, is a nonprofit facility, open to the public, run by the Corporation of the Presiding Bishop of The Church of Jesus Christ of Latter-day Saints (CPB), and the Corporation of the President of The Church of Jesus Christ of Latter-day Saints (COP). The CPB and the COP are religious entities associated with The Church of Jesus Christ of Latter-day Saints (Church), an unincorporated religious association sometimes called the Mormon or LDS Church.[3]

Appellee Mayson worked at the Gymnasium for some 16 years as an assistant building engineer and then as building engineer. He was discharged in 1981 because he failed to qualify for a temple recommend, that is, a certificate that he is a member of the Church and eligible to attend its temples.[4]

---

of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."

[2] Title 28 U. S. C. § 1252 permits any party to appeal to this Court from an interlocutory or final judgment, decree, or order of any court of the United States holding an Act of Congress unconstitutional in any civil action to which the United States is a party.

[3] The CPB and the COP are "corporations sole" organized under Utah law to perform various activities on behalf of the Church. Both corporations are tax-exempt, nonprofit religious entities under § 501(c)(3) of the Internal Revenue Code. Appellees do not contest that the CPB and the COP are religious organizations for purposes of § 702.

[4] Temple recommends are issued only to individuals who observe the Church's standards in such matters as regular church attendance, tithing, and abstinence from coffee, tea, alcohol, and tobacco.

Mayson and others purporting to represent a class of plaintiffs brought an action against the CPB and the COP alleging, among other things, discrimination on the basis of religion in violation of § 703 of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–2.[5] The defendants moved to dismiss this claim on the ground that § 702 shields them from liability. The plaintiffs contended that if construed to allow religious employers to discriminate on religious grounds in hiring for nonreligious jobs, § 702 violates the Establishment Clause.

The District Court first considered whether the facts of these cases require a decision on the plaintiffs' constitutional argument. Starting from the premise that the religious activities of religious employers can permissibly be exempted under § 702, the court developed a three-part test to determine whether an activity is religious.[6] Applying this test to

---

[5] The District Court did not certify a class. The other plaintiffs below, whose claims are not at issue in this appeal, initially included former employees of Beehive Clothing Mills, which manufactures garments with religious significance for Church members. The complaint was amended to add as plaintiff a former employee of Deseret Industries, a division of the Church's Welfare Services Department. The District Court's rulings on the other plaintiffs' claims are described at n. 13, *infra*.

[6] The District Court described the test as follows:

"First, the court must look at the tie between the religious organization and the activity at issue with regard to such areas as financial affairs, day-to-day operations and management. Second, whether or not there is a close and substantial tie between the two, the court next must examine the nexus between the primary function of the activity in question and the religious rituals or tenets of the religious organization or matters of church administration. If there is substantial connection between the activity in question and the religious organization's religious tenets or matters of church administration and the tie under the first part of the test is close, the court does not need to proceed any further and may declare the activity religious. . . . However, where the tie between the religious entity and activity in question is either close or remote under the first prong of the test and the nexus between the primary function of the activity in question and the religious tenets or rituals of the religious organization or matters of church administration is tenuous or non-existent, the court must engage in a third inquiry. It must consider the relationship between the nature of

Mayson's situation, the court found: first, that the Gymnasium is intimately connected to the Church financially and in matters of management; second, that there is no clear connection between the primary function which the Gymnasium performs and the religious beliefs and tenets of the Mormon Church or church administration;[7] and third, that none of Mayson's duties at the Gymnasium are "even tangentially related to any conceivable religious belief or ritual of the Mormon Church or church administration," 594 F. Supp. 791, 802 (Utah 1984). The court concluded that Mayson's case involves nonreligious activity.[8]

The court next considered the plaintiffs' constitutional challenge to § 702. Applying the three-part test set out in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), the court first held that § 702 has the permissible secular purpose of "assuring that the government remains neutral and does not meddle in religious affairs by interfering with the decision-making process in religions . . . ." 594 F. Supp, at 812.[9]

the job the employee is performing and the religious rituals or tenets of the religious organization or matters of church administration. If there is a substantial relationship between the employee's job and church administration or the religious organization's rituals or tenets, the court must find that the activity in question is religious. If the relationship is not substantial, the activity is not religious." 594 F. Supp. 791, 799 (Utah 1984).

[7] The court found that "nothing in the running or purpose of [the Gymnasium] . . . suggests that it was intended to spread or teach the religious beliefs and doctrine and practices of sacred ritual of the Mormon Church or that it was intended to be an integral part of church administration." *Id.*, at 800. The court emphasized that no contention was made that the religious doctrines of the Mormon Church either require religious discrimination in employment or treat physical exercise as a religious ritual. *Id.*, at 801.

[8] The court also considered and rejected the possibility that § 702 could be construed to exempt a religious organization only with respect to employment involving religious activities. *Id.*, at 803–804.

[9] The court examined in considerable detail the legislative history of the 1972 amendment of § 702. *Id.*, at 805–812. Prior to that time, § 702 exempted only the religious activities of religious employers from the statutory proscription against religious discrimination in employment. The

The court concluded, however, that § 702 fails the second part of the *Lemon* test because the provision has the primary effect of advancing religion.[10]   Among the considerations mentioned by the court were: that § 702 singles out religious entities for a benefit, rather than benefiting a broad grouping of which religious organizations are only a part;[11] that § 702 is not supported by long historical tradition;[12] and that § 702 burdens the free exercise rights of employees of religious institutions who work in nonreligious jobs.   Finding that § 702 impermissibly sponsors religious organizations by granting them "an exclusive authorization to engage in conduct which can directly and immediately advance religious tenets and practices," *id.*, at 825, the court declared the statute unconstitutional as applied to secular activity.   The court entered summary judgment in favor of Mayson pursuant to Federal Rule of Civil Procedure 54(b) and ordered him reinstated with backpay.[13]   Subsequently, the court vacated its judg-

---

1972 amendment extending the exemption to all activities of religious organizations was sponsored by Senators Allen and Ervin.   Senator Ervin explained that the purpose of the amendment was to "take the political hands of Caesar off of the institutions of God, where they have no place to be." 118 Cong. Rec. 4503 (1972).

[10] The court rejected the defendants' arguments that § 702 is required both by the need to avoid excessive governmental entanglement with religion and by the Free Exercise Clause.   594 F. Supp., at 814–820.

[11] Cf., *e. g.*, *Mueller* v. *Allen*, 463 U. S. 388, 397 (1983) (provision of benefits to a broad spectrum of groups is an important index of secular effect); *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 794 (1973) (narrowness of benefited class is an important factor in evaluating whether effect of a law violates the Establishment Clause).

[12] Cf. *Walz* v. *Tax Comm'n*, 397 U. S. 664, 676–679 (1970) (relying in part, in upholding property tax exemption for religious groups, on long historical tradition for such exemptions).

[13] The court declared that its determination regarding § 702 "applies with equal force to the [similar] state exemption as it relates to the facts of this case."   594 F. Supp., at 798.   It deferred ruling on the plaintiffs' claim that § 702 violates the Due Process and Equal Protection Clauses of the United States Constitution, *id.*, at 828, and rejected the plaintiffs' state-

ment so that the United States could intervene to defend the constitutionality of § 702. After further briefing and argument the court affirmed its prior determination and reentered a final judgment for Mayson.

## II

"This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 144–145 (1987) (footnote omitted). It is well established, too, that "[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." *Walz* v. *Tax Comm'n*, 397 U. S. 664, 673 (1970). There is ample room under the Establishment Clause for "benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Id.*, at 669. At some point, accommodation may devolve into "an unlawful

---

law claims of wrongful discharge and intentional infliction of emotional distress, *id.*, at 828–830.

Subsequently, the court concluded that disputed issues of material fact precluded summary judgment for the Beehive employees (see n. 5, *supra*). 618 F. Supp. 1013, 1016 (Utah 1985).

A plaintiff added by amendment of the complaint, Ralph Whitaker, claimed impermissible religious discrimination in his discharge from the position of truckdriver by Deseret Industries (Industries) based on his failure to qualify for a temple recommend. Industries, a division of the Church's Welfare Services Department, runs a workshop program for the handicapped, retarded, and unemployed, who sort and assemble items and refurbish donated goods for sale in Industries' thrift stores. Relying on the Church's emphasis on charity and work, the court held that Industries is a religious activity because "there is an intimate connection between Industries and the defendants and the Mormon Church and between the primary function of Industries and the religious tenets of the Church." *Id.*, at 1027. Finding no Establishment Clause violation in applying the § 702 exemption to Industries, the court granted summary judgment against Whitaker, who did not appeal.

fostering of religion," *Hobbie, supra,* at 145, but these are not such cases, in our view.

The private appellants contend that we should not apply the three-part *Lemon* approach, which is assertedly unsuited to judging the constitutionality of exemption statutes such as § 702. Brief for Appellants in No. 86–179, pp. 24–26. The argument is that an exemption statute will always have the effect of advancing religion and hence be invalid under the second (effects) part of the *Lemon* test, a result claimed to be inconsistent with cases such as *Walz* v. *Tax Comm'n, supra,* which upheld property tax exemptions for religious organizations. The first two of the three *Lemon* factors, however, were directly taken from pre-*Walz* decisions, 403 U. S., at 612–613, and *Walz* did not purport to depart from prior Establishment Clause cases, except by adding a consideration that became the third element of the *Lemon* test. 403 U. S., at 613. In any event, we need not reexamine *Lemon* as applied in this context, for the exemption involved here is in no way questionable under the *Lemon* analysis.

*Lemon* requires first that the law at issue serve a "secular legislative purpose." *Id.,* at 612. This does not mean that the law's purpose must be unrelated to religion—that would amount to a requirement "that the government show a callous indifference to religious groups," *Zorach* v. *Clauson,* 343 U. S. 306, 314 (1952), and the Establishment Clause has never been so interpreted. Rather, *Lemon*'s "purpose" requirement aims at preventing the relevant governmental decisionmaker—in this case, Congress—from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.

Under the *Lemon* analysis, it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions. Appellees argue that there is no such purpose here because § 702 provided adequate protection for religious employers prior to the 1972 amendment,

when it exempted only the religious activities of such employers from the statutory ban on religious discrimination. We may assume for the sake of argument that the pre-1972 exemption was adequate in the sense that the Free Exercise Clause required no more. Nonetheless, it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission.[14] Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission.

After a detailed examination of the legislative history of the 1972 amendment, the District Court concluded that Congress' purpose was to minimize governmental "interfer[ence] with the decision-making process in religions." 594 F. Supp., at 812. We agree with the District Court that this purpose does not violate the Establishment Clause.

The second requirement under *Lemon* is that the law in question have "a principal or primary effect . . . that neither advances nor inhibits religion." 403 U. S., at 612. Undoubtedly, religious organizations are better able now to advance their purposes than they were prior to the 1972 amendment to § 702. But religious groups have been better able to advance their purposes on account of many laws that have passed constitutional muster: for example, the property tax exemption at issue in *Walz* v. *Tax Comm'n, supra,* or the loans of schoolbooks to schoolchildren, including parochial school students, upheld in *Board of Education* v. *Allen,* 392

---

[14] The present cases are illustrative of the difficulties: the distinction between Deseret Industries, see n. 13, *supra,* and the Gymnasium is rather fine. Both activities are run on a nonprofit basis, and the CPB and the COP argue that the District Court failed to appreciate that the Gymnasium as well as Deseret Industries is expressive of the Church's religious values. Brief for Appellants in No. 86–179, pp. 6–8, 19.

U. S. 236 (1968). A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose. For a law to have forbidden "effects" under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence. As the Court observed in *Walz*, "for the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." 397 U. S., at 668. Accord, *Lemon*, 403 U. S., at 612.

The District Court appeared to fear that sustaining the exemption would permit churches with financial resources impermissibly to extend their influence and propagate their faith by entering the commercial, profit-making world. 594 F. Supp., at 825. The cases before us, however, involve a nonprofit activity instituted over 75 years ago in the hope that "all who assemble here, and who come for the benefit of their health, and for physical blessings, [may] feel that they are in a house dedicated to the Lord." Dedicatory Prayer for the Gymnasium, quoted, 594 F. Supp., at 800–801, n. 15. These cases therefore do not implicate the apparent concerns of the District Court. Moreover, we find no persuasive evidence in the record before us that the Church's ability to propagate its religious doctrine through the Gymnasium is any greater now than it was prior to the passage of the Civil Rights Act in 1964. In such circumstances, we do not see how any advancement of religion achieved by the Gymnasium can be fairly attributed to the Government, as opposed to the Church.[15]

---

[15] Undoubtedly, Mayson's freedom of choice in religious matters was impinged upon, but it was the Church (through the COP and the CPB), and not the Government, who put him to the choice of changing his religious practices or losing his job. This is a very different case than *Estate of Thornton* v. *Caldor, Inc.*, 472 U. S. 703 (1985). In *Caldor*, the Court struck down a Connecticut statute prohibiting an employer from requiring an employee to work on a day designated by the employee as his Sabbath. In effect, Connecticut had given the force of law to the employee's designa-

We find unpersuasive the District Court's reliance on the fact that § 702 singles out religious entities for a benefit. Although the Court has given weight to this consideration in its past decisions, see n. 11, *supra*, it has never indicated that statutes that give special consideration to religious groups are *per se* invalid. That would run contrary to the teaching of our cases that there is ample room for accommodation of religion under the Establishment Clause. See *supra*, at 334–335. Where, as here, government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption come packaged with benefits to secular entities.

We are also unpersuaded by the District Court's reliance on the argument that § 702 is unsupported by long historical tradition. There was simply no need to consider the scope of the § 702 exemption until the 1964 Civil Rights Act was passed, and the fact that Congress concluded after eight years that the original exemption was unnecessarily narrow is a decision entitled to deference, not suspicion.

Appellees argue that § 702 offends equal protection principles by giving less protection to the employees of religious employers than to the employees of secular employers.[16] Appellees rely on *Larson* v. *Valente*, 456 U. S. 228, 246

---

tion of a Sabbath day and required accommodation by the employer regardless of the burden which that constituted for the employer or other employees. See *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 145, n. 11 (1987). In the present cases, appellee Mayson was not legally obligated to take the steps necessary to qualify for a temple recommend, and his discharge was not required by statute. We find no merit in appellees' contention that § 702 "impermissibly delegates governmental power to religious employees and conveys a message of governmental endorsement of religious discrimination." Brief for Appellees 31.

[16] Appellees also argue that § 702 violates equal protection principles by giving religious employers greater leeway to discriminate than secular employers. It is not clear why appellees should have standing to represent the interests of secular employers, but in any event this argument is, practically speaking, merely a restatement of the first point.

(1982), for the proposition that a law drawing distinctions on religious grounds must be strictly scrutinized. But *Larson* indicates that laws discriminating *among* religions are subject to strict scrutiny, *ibid.*, and that laws "affording a uniform benefit to *all* religions" should be analyzed under *Lemon*, 456 U. S., at 252. In cases such as these, where a statute is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, we see no justification for applying strict scrutiny to a statute that passes the *Lemon* test. The proper inquiry is whether Congress has chosen a rational classification to further a legitimate end. We have already indicated that Congress acted with a legitimate purpose in expanding the § 702 exemption to cover all activities of religious employers. *Supra*, at 336. To dispose of appellees' equal protection argument, it suffices to hold—as we now do—that as applied to the nonprofit activities of religious employers, § 702 is rationally related to the legitimate purpose of alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions.

It cannot be seriously contended that § 702 impermissibly entangles church and state; the statute effectuates a more complete separation of the two and avoids the kind of intrusive inquiry into religious belief that the District Court engaged in in this case. The statute easily passes muster under the third part of the *Lemon* test.[17]

---

[17] We have no occasion to pass on the argument of the COP and the CPB that the exemption to which they are entitled under § 702 is required by the Free Exercise Clause.

Appellees argue that § 702 creates danger of political divisiveness along political lines. As the Court stated in *Lynch* v. *Donnelly*, 465 U. S. 668, 684 (1984):

"[T]his Court has not held that political divisiveness alone can serve to invalidate otherwise permissible conduct. And we decline to so hold today. This case does not involve a direct subsidy to church-sponsored schools or colleges, or other religious institutions, and hence no inquiry into political

The judgment of the District Court is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in the judgment.

I write separately to emphasize that my concurrence in the judgment rests on the fact that these cases involve a challenge to the application of § 702's categorical exemption to the activities of a *nonprofit* organization. I believe that the particular character of nonprofit activity makes inappropriate a case-by-case determination whether its nature is religious or secular.

These cases present a confrontation between the rights of religious organizations and those of individuals. Any exemption from Title VII's proscription on religious discrimination necessarily has the effect of burdening the religious liberty of prospective and current employees. An exemption says that a person may be put to the choice of either conforming to certain religious tenets or losing a job opportunity, a promotion, or, as in these cases, employment itself.[1]

divisiveness is even called for, *Mueller* v. *Allen*, 463 U. S. 388, 403–404, n. 11 (1983)."

[1] The fact that a religious organization is permitted, rather than required, to impose this burden is irrelevant; what is significant is that the burden is the effect of the exemption. See *Lemon* v. *Kurtzman*, 403 U. S. 602, 612 (1971). An exemption by its nature merely permits certain behavior, but that has never stopped this Court from examining the *effect* of exemptions that would free religion from regulations placed on others. See, *e. g.*, *United States* v. *Lee*, 455 U. S. 252, 261 (1982) ("Granting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees"); *Walz* v. *Tax Comm'n*, 397 U. S. 664, 674 (1970) (legislative purpose in granting tax exemption not determinative; "[w]e must also be sure that the end result—the effect—is not an excessive government entanglement with religion"); see also *Wisconsin* v. *Yoder*, 406 U. S. 205, 220–221 (1972) ("The Court must not ignore the danger that an exception from a general obligation of citizenship on reli-

The potential for coercion created by such a provision is in serious tension with our commitment to individual freedom of conscience in matters of religious belief.[2]

At the same time, religious organizations have an interest in autonomy in ordering their internal affairs, so that they may be free to:

> "select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions. Religion includes important communal elements for most believers.   They exercise their religion through religious organizations, and these organizations must be protected by the [Free Exercise] [C]lause."   Laycock, Towards a General Theory of the Religion Clauses: The

gious grounds may run afoul of the Establishment Clause").   This approach reflects concern not only about the impact of exemptions on others, but also awareness that:

"Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines.   If this identification conveys a message of government endorsement . . . of religion, a core purpose of the Establishment Clause is violated."   *Grand Rapids School Dist.* v. *Ball*, 473 U. S. 373, 389 (1985).

In these cases, as JUSTICE O'CONNOR cogently observes in her concurrence, "[t]he Church had the power to put [appellee] Mayson to a choice of qualifying for a temple recommend or losing his job because the *Government* had lifted from religious organizations the general regulatory burden imposed by § 702." *Post*, at 347.

[2] As James Madison expressed it:

"[W]e hold it for a fundamental and undeniable truth, 'that Religion or the duty which we owe to our Creator and the Manner of discharging it, can be directed only by reason and conviction, not by force or violence.' The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate."   J. Madison, Memorial and Remonstrance Against Religious Assessment, in 2 Writings of James Madison 184 (G. Hunt ed. 1901) (quoting Virginia Declaration of Rights, Art. 16).

See also *Wallace* v. *Jaffree*, 472 U. S. 38, 50 (1985) ("[T]he Court has identified the individual's freedom of conscience as the central liberty that unifies the various Clauses in the First Amendment").

Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1389 (1981).

See also *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, 426 U. S. 696 (1976) (church has interest in effecting binding resolution of internal governance disputes); *Kedroff* v. *Saint Nicholas Cathedral*, 344 U. S. 94 (1952) (state statute purporting to transfer administrative control from one church authority to another violates Free Exercise Clause). For many individuals, religious activity derives meaning in large measure from participation in a larger religious community. Such a community represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals.[3] Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself. Solicitude for a church's ability to do so reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well.

The authority to engage in this process of self-definition inevitably involves what we normally regard as infringement on free exercise rights, since a religious organization is able to condition employment in certain activities on subscription to particular religious tenets. We are willing to countenance the imposition of such a condition because we deem it vital that, if certain activities constitute part of a religious community's practice, then a religious organization should be able to

---

[3] See, *e. g.*, K. Barth, The Christian Community and the Civil Community, in Community, State and Church 149 (1960); Cover, The Supreme Court, 1982 Term—Foreword: Nomos and Narrative, 97 Harv. L. Rev. 4 (1983). Cf. Perry, The Authority of Text, Tradition, and Reason: A Theory of Constitutional "Interpretation," 58 S. Cal. L. Rev. 551, 558 (1985) (tradition represents "a particular history or narrative, in which the central motif is an aspiration to a particular form of life, to certain projects, goals, [and] ideals, and the central discourse . . . is an argument . . . about how that form of life is to be cultivated and revised").

require that only members of its community perform those activities.

This rationale suggests that, ideally, religious organizations should be able to discriminate on the basis of religion *only* with respect to religious activities, so that a determination should be made in each case whether an activity is religious or secular. This is because the infringement on religious liberty that results from conditioning performance of *secular* activity upon religious belief cannot be defended as necessary for the community's self-definition. Furthermore, the authorization of discrimination in such circumstances is not an accommodation that simply enables a church to gain members by the normal means of prescribing the terms of membership for those who seek to participate in furthering the mission of the community. Rather, it puts at the disposal of religion the added advantages of economic leverage in the secular realm. As a result, the authorization of religious discrimination with respect to nonreligious activities goes beyond reasonable accommodation, and has the effect of furthering religion in violation of the Establishment Clause. See *Lemon* v. *Kurtzman*, 403 U. S. 602, 612 (1971).

What makes the application of a religious-secular distinction difficult is that the character of an activity is not self-evident. As a result, determining whether an activity is religious or secular requires a searching case-by-case analysis. This results in considerable ongoing government entanglement in religious affairs. See *id.*, at 613. Furthermore, this prospect of government intrusion raises concern that a religious organization may be chilled in its free exercise activity. While a church may regard the conduct of certain functions as integral to its mission, a court may disagree. A religious organization therefore would have an incentive to characterize as religious only those activities about which there likely would be no dispute, even if it genuinely believed that religious commitment was important in performing other tasks as well. As a result, the community's process

of self-definition would be shaped in part by the prospects of litigation. A case-by-case analysis for all activities therefore would both produce excessive government entanglement with religion and create the danger of chilling religious activity.

The risk of chilling religious organizations is most likely to arise with respect to *nonprofit* activities. The fact that an operation is not organized as a profit-making commercial enterprise makes colorable a claim that it is not purely secular in orientation. In contrast to a for-profit corporation, a nonprofit organization must utilize its earnings to finance the continued provision of the goods or services it furnishes, and may not distribute any surplus to the owners. See generally Hansmann, The Role of Nonprofit Enterprise, 89 Yale L. J. 835 (1980). This makes plausible a church's contention that an entity is not operated simply in order to generate revenues for the church, but that the activities themselves are infused with a religious purpose. Furthermore, unlike for-profit corporations, nonprofits historically have been organized specifically to provide certain community services, not simply to engage in commerce. Churches often regard the provision of such services as a means of fulfilling religious duty and of providing an example of the way of life a church seeks to foster.[4]

---

[4] Until quite recently it was common for state laws to permit an entity to incorporate as a nonprofit only if formed to serve one or more of a limited set of purposes. Hansmann, The Role of Nonprofit Enterprise, 89 Yale L. J. 835, 839 (1980). Many States, however, now permit the formation of a nonprofit corporation for any lawful purpose. *Ibid.* If it were possible easily to transform an enterprise that appeared commercial in substance into one nonprofit in form, a church's decision to do so might signal that the church regarded the religious character of an entity as so significant that it was willing to forgo direct financial benefits in order to be able to hire persons committed to the church's mission. Nonetheless, if experience proved that nonprofit incorporation was frequently used simply to evade Title VII, I would find it necessary to reconsider the judgment in these cases.

Nonprofit activities therefore are most likely to present cases in which characterization of the activity as religious or secular will be a close question. If there is a danger that a religious organization will be deterred from classifying as religious those activities it actually regards as religious, it is likely to be in this domain.[5] This substantial potential for chilling religious activity makes inappropriate a case-by-case determination of the character of a nonprofit organization, and justifies a categorical exemption for nonprofit activities. Such an exemption demarcates a sphere of deference with respect to those activities most likely to be religious. It permits infringement on employee free exercise rights in those instances in which discrimination is most likely to reflect a religious community's self-definition. While not every nonprofit activity may be operated for religious purposes, the likelihood that many are makes a categorical rule a suitable means to avoid chilling the exercise of religion.[6]

Sensitivity to individual religious freedom dictates that religious discrimination be permitted only with respect to employment in religious activities. Concern for the autonomy of religious organizations demands that we avoid the entanglement and the chill on religious expression that a case-by-case determination would produce. We cannot escape the fact that these aims are in tension. Because of the nature of nonprofit activities, I believe that a categorical exemption for

---

[5] Furthermore, as JUSTICE O'CONNOR notes in her excellent concurrence, when an exemption is provided for nonprofit activity, "the objective observer should perceive the government action as an accommodation of the exercise of religion, rather than as a government endorsement of religion." *Post*, at 349.

[6] It is also conceivable that some for-profit activities could have a religious character, so that religious discrimination with respect to these activities would be justified in some cases. The cases before us, however, involve a nonprofit organization; I believe that a *categorical* exemption authorizing discrimination is particularly appropriate for such entities, because claims that they possess a religious dimension will be especially colorable.

such enterprises appropriately balances these competing concerns. As a result, I concur in the Court's judgment that the nonprofit Deseret Gymnasium may avail itself of an automatic exemption from Title VII's proscription on religious discrimination.

JUSTICE BLACKMUN, concurring in the judgment.

Essentially for the reasons set forth in JUSTICE O'CONNOR's opinion, particularly the third and final paragraphs thereof, I too, concur in the judgment of the Court. I fully agree that the distinction drawn by the Court seems "to obscure far more than to enlighten," as JUSTICE O'CONNOR states, *post*, at 347, and that, surely, the "question of the constitutionality of the § 702 exemption as applied to for-profit activities of religious organizations remains open," *post*, at 349.

JUSTICE O'CONNOR, concurring in the judgment.

Although I agree with the judgment of the Court, I write separately to note that this action once again illustrates certain difficulties inherent in the Court's use of the test articulated in *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971). See *Wallace* v. *Jaffree*, 472 U. S. 38, 67 (1985) (O'CONNOR, J., concurring in judgment); *Lynch* v. *Donnelly*, 465 U. S. 668, 687 (1984) (O'CONNOR, J., concurring). As a result of this problematic analysis, while the holding of the opinion for the Court extends only to nonprofit organizations, its reasoning fails to acknowledge that the amended § 702, 42 U. S. C. § 2000e–1, raises different questions as it is applied to profit and nonprofit organizations.

In *Wallace* v. *Jaffree, supra,* I noted a tension in the Court's use of the *Lemon* test to evaluate an Establishment Clause challenge to government efforts to accommodate the free exercise of religion:

"On the one hand, a rigid application of the *Lemon* test would invalidate legislation exempting religious observers from generally applicable government obligations.

By definition, such legislation has a religious purpose and effect in promoting the free exercise of religion. On the other hand, judicial deference to all legislation that purports to facilitate the free exercise of religion would completely vitiate the Establishment Clause. Any statute pertaining to religion can be viewed as an 'accommodation' of free exercise rights." *Wallace* v. *Jaffree, supra,* at 82.

In my view, the opinion for the Court leans toward the second of the two unacceptable options described above. While acknowledging that "[u]ndoubtedly, religious organizations are better able now to advance their purposes than they were prior to the 1972 amendment to § 702," the Court seems to suggest that the "effects" prong of the *Lemon* test is not at all implicated as long as the government action can be characterized as "allowing" religious organizations to advance religion, in contrast to government action directly advancing religion. *Ante,* at 337. This distinction seems to me to obscure far more than to enlighten. Almost any government benefit to religion could be recharacterized as simply "allowing" a religion to better advance itself, unless perhaps it involved actual proselytization by government agents. In nearly every case of a government benefit to religion, the religious mission would not be advanced if the religion did not take advantage of the benefit; even a direct financial subsidy to a religious organization would not advance religion if for some reason the organization failed to make any use of the funds. It is for this same reason that there is little significance to the Court's observation that it was the Church rather than the Government that penalized Mayson's refusal to adhere to Church doctrine. *Ante,* at 337, n. 15. The Church had the power to put Mayson to a choice of qualifying for a temple recommend or losing his job because *the Government* had lifted from religious organizations the general regulatory burden imposed by § 702.

The necessary first step in evaluating an Establishment Clause challenge to a government action lifting from religious organizations a generally applicable regulatory burden is to recognize that such government action *does* have the effect of advancing religion. The necessary second step is to separate those benefits to religion that constitutionally accommodate the free exercise of religion from those that provide unjustifiable awards of assistance to religious organizations. As I have suggested in earlier opinions, the inquiry framed by the *Lemon* test should be "whether government's purpose is to endorse religion and whether the statute actually conveys a message of endorsement." *Wallace*, 472 U. S., at 69. To ascertain whether the statute conveys a message of endorsement, the relevant issue is how it would be perceived by an objective observer, acquainted with the text, legislative history, and implementation of the statute. *Id.*, at 76. Of course, in order to perceive the government action as a permissible accommodation of religion, there must in fact be an identifiable burden *on the exercise of religion* that can be said to be lifted by the government action. The determination whether the objective observer will perceive an endorsement of religion "is not a question of simple historical fact. Although evidentiary submissions may help answer it, the question is, like the question whether racial or sex-based classifications communicate an invidious message, in large part a legal question to be answered on the basis of judicial interpretation of social facts." *Lynch* v. *Donnelly, supra*, at 693–694.

The above framework, I believe, helps clarify why the amended § 702 raises different questions as it is applied to nonprofit and for-profit organizations. As JUSTICE BRENNAN observes in his concurrence: "The fact that an operation is not organized as a profit-making commercial enterprise makes colorable a claim that it is not purely secular in orientation." *Ante*, at 344 (opinion concurring in judgment). These cases involve a Government decision to lift from a non-

profit activity of a religious organization the burden of demonstrating that the particular nonprofit activity is religious as well as the burden of refraining from discriminating on the basis of religion. Because there is a probability that a nonprofit activity of a religious organization will itself be involved in the organization's religious mission, in my view the objective observer should perceive the Government action as an accommodation of the exercise of religion rather than as a Government endorsement of religion.

It is not clear, however, that activities conducted by religious organizations solely as profit-making enterprises will be as likely to be directly involved in the religious mission of the organization. While I express no opinion on the issue, I emphasize that under the holding of the Court, and under my view of the appropriate Establishment Clause analysis, the question of the constitutionality of the § 702 exemption as applied to for-profit activities of religious organizations remains open.