KLEINFELD, Circuit Judge,
concurring:
All three of us agree that a multifactor test does not work well because it is inherently too indeterminate and subjective, but we disagree on what the test ought to be. I write separately because, although I agree with Judge O’Scannlain that we should affirm, I disagree with both my colleagues’ formulations of the test to be applied. I concur in Parts I, II, and IV of Judge O’Scannlain’s opinion.
The Civil Rights Act of 1964 generally prohibits discrimination based on religion, but exempts religious institutions:
This subchapter shall not apply to ... a religious corporation, association, edu *1127 cational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.[1]
Our task is to decide whether World Vision is a “religious corporation, association, educational institution, or society.”
Judge O’Scannlain formulates this test: “a nonprofit entity qualifies for the section 2000e-l exemption if it establishes that it 1) is organized for a self-identified religious purpose (as evidenced by Articles of Incorporation or similar foundational documents), 2) is engaged in activity consistent with, and in furtherance of, those religious purposes, and 3) holds itself out to the public as religious.” Judge Berzon formulates this one: “Congress used the terms ‘religious corporation, association ... or society’ ... to describe a church or other group organized for worship, religious study, or the dissemination of religious doctrine.” I agree with Judge O’Scannlain that World Vision falls within the statutory exemption, but in my view, his test is too inclusive, and Judge Berzon’s is too exclusive.
The Civil Rights Act and the exemption are not mere words. They are designed to accomplish something, they have purposes, and the words cannot be understood without considering the purposes. Purposes are not the same thing as legislative history, often merely a depositary for lobbyists’ requests that did not make it into the statute.[2] The Civil Rights Act of 1964 is intended to free us from the curse of discrimination in hiring by “race, color, religion, sex, or national origin.”[3] But without an exemption for religious institutions, that Act would have the unintended consequence of preventing the free exercise of religion.[4] If the government coerced staffing of religious institutions by persons who rejected or even were hostile to the religions the institutions were intended to advance, then the shield against discrimination would destroy the freedom of Americans to practice their religions. Judge O’Scannlain’s test would facilitate free exercise of religion, but would also allow people to advance discriminatory objectives outside the context of religious exercise by means of mere corporate paperwork. Judge Berzon’s would limit religious exercise to worship, study, and dissemination, and deny people the freedom to employ only people who share then-religion for their other religious activities. If an interpretation disserves the evident purposes of the Civil Rights Act and the religious institution exemption, then it is probably mistaken.
Judge Berzon’s reading purports to be a noscitur a sociis construction, but ignores the phrase “educational institution.” The justification she gives is that World Vision is not an educational institution, but the phrase cannot be ignored if we are to use noscitur a sociis as an interpretive aid. The statute does not say “religious corpo *1128 ration, association, or society.” It says “religious corporation, association, educational institution, or society.” Congress quite plainly, by including “educational institution” in the exemption, expressed a purpose of exempting religious institutions that were not churches, not just those that were. Noscitur a sociis is an aid to construction useful for determining what Congress meant, though not a doctrine of law.[5] The Latin phrase means that “the meaning of doubtful words may be determined by reference to associated words and phrases.” [6] Because “educational institution” is among the “associated words and phrases,” it cannot be elided when using associated words and phrases to figure out what the ones at issue mean. And once considered, the phrase “educational institution” compels the conclusion that Congress did not limit the exemption to churches and synonyms for churches.
Judge Berzon’s interpretation fails because, first, as explained above, we cannot determine the meaning by reference to associated words and phrases without considering all the associated words and phrases, and one of them, “educational institution,” is not a synonym for “church,” nor do church schools function merely as places of religious study or disseminators of religious doctrine. Typically most of the courses are secular. Teaching children the multiplication tables and Silas Mamer is not religious study or dissemination of religious doctrine, yet that sort of thing is how most of the day is spent at parochial schools. Nor does “religious association” mean “church, temple, synagogue, or mosque,” as Judge Berzon would have it. Had Congress meant to say that, it would have. Fair application of noscitur a sociis requires us to find something in common among all the associated words and phrases, not just some of them.
Second, Judge Berzon’s approach ignores the additional canon, that all the words of the statute must be accorded some meaning, rather than treating some as superfluous. “It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute.”[7] Indeed, Judge Ber-zon’s construction would require us to ignore an entire statutory definition: “The term ‘religion’ includes all aspects of religious observance and practice,”[8] a definition irreconcilable with her proposition that it means basically what people do in church: worship, study, and disseminate religious doctrine to the congregation. Judge Berzon suggests that although the statute provides a definition of the noun form of the word “religion,” that definition has no bearing on the meaning of the adjective “religious” in the same statute.
Third, Judge Berzon’s narrowing of the exemption prevents the exemption from accomplishing its purpose, protecting the free exercise of religion. Since the earliest times in the Judeo-Christian tradition, religion has meant more than prayer,[9] and has even denigrated prayer where it is not *1129 connected with goodness toward one’s fellow man.[10] Under Judge Berzon’s reading, if several Protestant churches of various denominations organize an association to employ missionaries in the field, they can limit their hiring to Protestants only if the missionary work is limited to preaching. If the Protestant missionaries proselytize by example, showing rather than telling how to be a good Christian, then the Protestants have to hire atheists, Jews, and Catholics without discrimination to do their Protestant missionary work. Sometimes religious activity consists of being a “City upon a Hill.” She would have the Protestant group avoid Title VII by claiming religion as a bona fide occupational requirement, but it is hard to see why it would be, since the activity is outside Judge Berzon’s view of religion.
Judge Berzon’s approach does not even accomplish the narrowing she evidently seeks, because it is not so easy to say just what “worship” is, what type of study qualifies as “religious study,” or what counts as “dissemination of religious doctrine.” Is the Catholic school still religious, in Judge Berzon’s view, if the children learn reading, writing, and arithmetic? Was Father Damien’s work caring for the lepers on Molokai religious?
Judge Berzon’s narrow list of acceptable religious practices excludes numerous religious traditions. It is not clear whether she would accept as a religious association a traditional Inner Light Quaker “meeting” in a “meeting house,” where “congregants worship in silence or speak only when they feel inwardly led to do so.” [11] What about a Santería shrine where chickens are sacrificed?[12] Is animal sacrifice worship? It was good enough for the Supreme Court in Lukumi, but appears not to fall within Judge Berzon’s definition.
If only churches and the like are within the exemption, as she contends, the religious exemption would be limited to employees in the buildings where people sit, stand, and kneel as they recite traditional prayers and sing traditional hymns. Judge Berzon’s interpretation of the exemption would better fit the mining equipment manufacturer in EEOC v. Townley Engineering & Manufacturing Co.,[13] than an “Inner Light” tradition Quaker meeting, since the manufacturing plant held mandatory devotional services every week where everyone recited prayers.
As the government brief points out, under Judge Berzon’s view, Mother Theresa’s mission, performing humanitarian work, would be classed as secular, so if she were performing it in America, she would have to employ people who rejected the underlying religious premise of her enterprise hoping that despite their philosophical rejection, they would perform it faithfully to her ideals. On what principle can Judge Berzon concede, as she does, that Mother Theresa’s work was religious, yet contend, as she does, that her organization could be religious only if it were limited to “worship, religious study, or the dissemination of religious doctrine.” Since it was not, perhaps under Judge Berzon’s view it would be appropriate to launch a class action against Mother Theresa’s organization and similar ones if they engaged in religious discrimination in hiring or because of the severe and pervasive pressure *1130 of the religiosity of the workplace. Judge Berzon notes that “the Falun Gong, the Quakers, or Mother Theresa’s mission should not be classed as secular solely because certain of their activities occur outside of a physical church.”[14] Her adverb “solely” may imply that they should be classed as secular for that reason combined with others.
The core of Judge Berzon’s dissent is the idea that performance of activities that are often performed in a secular context cannot be religious. That is mistaken. When the Pope washes feet on the Thursday before Easter, that is not secular hygiene, and the Pope is not a pedicurist. Confession to a priest and confession to a psychiatrist may have the same content, but that does not make confessing to a priest secular. Fitness clubs and Falun Gong both perform calisthenics. Religious missionaries and Peace Corps volunteers both perform humanitarian work, but only the latter is secular. Humanitarian work may be a secular or a religious activity, depending on motivation and meaning among those who perform it.
Judge O’Scannlairis test errs because of its focus on nonprofit corporate organization. Some people worship in assemblies in each others’ homes or borrowed conference rooms, with no corporate apparatus. Particularly when the congregations are small, such as a few Jews, Quakers, or Unitarians in a small town, they may not incorporate, and they may on some occasion employ a number of students to run a religious summer camp to instill their religion in their children, yet the exemption under Judge O’Scannlairis definition would not enable them to limit hiring to coreligionists. Absence of corporate papers and nonprofit status would defeat the exemption under his test, if nonprofit corporate and tax status is a sine qua non.
The narrowness problem may be repairable by a tweak in the test, but the over-breadth problem is not. Judge O’Scann-lain’s test is too broad because it would allow nonprofit institutions with church affiliations to use their affiliations as a cover for religious discrimination in secular employment. Judge Berzon is correct that under Judge O’Scannlain’s test, the mining equipment company in Townley could discriminate by religion simply by incorporating itself as a nonprofit and getting 501(c)(3) status.
There is not much congruence between nonprofit status and the free exercise of religion, or any eleemosynary purpose. Any enterprise can be operated as a 501(c)(3) nonprofit if its stated purpose is “religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals.” [15] The Townley Manufacturing Company could, if it chose, be organized *1131 for a self-identified religious purpose as a nonprofit as evidenced by its articles of incorporation, engage in its regular religious devotions, and hold itself out as a Christian mining equipment manufacturer, satisfying Judge O’Scannlain’s test. Nonprofit status would require that it pay out the surplus of revenue over other expenses as salaries instead of as dividends, but most closely held corporations do that anyway. Nonprofit status affects corporate governance, not eleemosynary activities. We lawyers organize corporations as nonprofits when a tax exemption is sought, or so that board members can pick their successors and avoid the need to repurchase stock from surviving spouses after the deaths of the principals. “For profit” and “nonprofit” have nothing to do with making money. As the CEO of National Geographic said, “[njonprofít means non-taxable — it doesn’t mean you don’t make a profit.”[16]
For example, physicians may organize a hospital as a nonprofit affiliated with a church, stating a religious purpose of healing the sick in its articles and bylaws. The hospital may then charge full market prices to patients and their insurers, and pay the physicians who organized it and their employees around $50,000 a year for residents, $200,000 a year for employed physicians working a week on, week off, and $400,000 a year for radiologists. It can defend its stated religious purpose with the true argument that whatever church it affiliates with promotes healing the sick as a religious duty. Yet the nonprofit hospital differs from a for-profit hospital only in that the board does not have to concern itself with pesky stockholders and does not have to pay income taxes on the excess of revenues over expenses and depreciation. The free exercise concern protected by the exemption does not suggest that the hospital should be allowed to discriminate by religion in hiring, since physicians, nurses, and other employees can perform their tasks equally well regardless of their religious beliefs.
I offer this hypothetical not only because it illustrates the overbreadth of Judge O’Scannlain’s test, but also because hospitals do indeed have a history of religious discrimination. Hospitals used to avoid hiring Jews for residencies, a major reason why Jewish hospitals were created in the United States.[17] That is not likely to occur now, but if the exemption applies, then hiring committees could discriminate according to whatever personal prejudices hiring physicians might have. The purpose of religious discrimination might not be to advance a religious objective in the practice of medicine, but rather to indulge bigotry against Jews, Catholics, Mormons, Seventh Day Adventists, fundamentalist Protestants, or others. There is no reason to extend the exemption to such an institution.
We can arrive at a usable modification of Judge O’Scannlain’s test by considering the difference between the hypothetical hospital and the Salvation Army. They both render services to people of different or no religions. Both are organized as *1132 nonprofits with express religious purposes. Both get charitable contributions. The Salvation Army really is intended to perform a Christian mission for religious purposes, and the hospital is not, having as its real objective the performance of medical services to serve the body and not the soul. But it is not practical for courts to look into the hearts of the Salvation Army executives and the hospital executives and make a judgment about their real purposes. There is one big objectively ascertainable difference: how they charge. The hospital gets money by exchanging valuable services for their market value in cash. The Salvation Army gives its homeless shelter and soup kitchen services away, or charges nominal fees, perhaps eight dollars a night for a bed worth fifty dollars a night.
Likewise, World Vision ministers to people to serve a religious purpose. Many churches are too small to do this themselves, and have to group together with other small, impecunious churches to do their mission and service work, so World Vision is an association but not a church. The evidence makes it quite clear that the idea is not merely foreign aid in poor countries, but what amounts to missionary work by making its service providers exemplars of Christian charity. World Vision is like the hypothetical missionary enterprise of a group of Protestant churches of various denominations described earlier, except that they show by example, rather than by express proselytizing, that theirs is a good religion. No doubt many of its beneficiaries will become Christians, just as Sokka Gakkai assisted by church groups in their transitions to American life sometimes become firm adherents of the churches that have helped them.[18] A missionary does not necessarily have to make people sing hymns for then-supper to persuade his beneficiaries of the goodness of the tenets of his religion.
And unlike the hypothetical hospital, World Vision does not charge its beneficiaries the market value of its services. So far as we can tell from the record, it does not charge them at all. Looking at how an institution charges offers an objective test for sorting out which institutions are designed to exchange goods or services for money, from those designed to give them away except perhaps for nominal charges in order to serve a religious objective. This objective measure relates closely to the purpose of the exemption. We can tell much about an institution’s purpose by looking at the objective evidence of how it charges. A religious purpose may be a motive, or money may be a motive, for work that serves others. If money is not available as an incentive, that is strong evidence, in the purportedly religious institution, that exercise of religion is the objective. If satisfaction of a religious purpose is insufficient to motivate the performance, then the performance may be consistent with religion but not motivated by it. There is nothing wrong with money as an incentive, but its presence or absence is strong evidence of what the incentive is.[19]
*1133 This discussion does not cover educational institutions, and religious schools may charge market rates as tuition. But they have their own phrase in the exemption, “educational institution,” so they do not have to fall within the harder to define phrases in the exemption for “religious corporation, association, educational institution, or society.” The inclusion of educational institutions suggests a more sensible noscitur a sociis reading of the exemption for “religious corporation, association, educational institution, or society.” What they all have in common is that they are means by which people engage in the free exercise of their religions. Many religions have as central requirements that their adherents teach the religions to their children.[20] Religious schools are how they do it, but they are often too expensive to operate supported out of charitable contributions, and need substantial tuitions. For the others, to determine whether the associations are religious or not for purposes of the exemption, what they charge for their services is an appropriate and usable test. For that matter, even if some educational institutions might otherwise be viewed as too secular in what they actually teach to qualify for the exemption, they would nevertheless be allowed by Congress to discriminate in hiring and employment by the alternative provision for schools “in whole or substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society.”[21]
Accordingly, I would reformulate Judge O’Scannlain’s test as this: To determine whether an entity is a “religious corporation, association, or society,” determine whether it is organized for a religious purpose, is engaged primarily in carrying out that religious purpose, holds itself out to the public as an entity for carrying out that religious purpose, and does not engage primarily or substantially in the exchange of goods or services for money beyond nominal amounts.
Under that test, World Vision is a religious corporation, so I would affirm.

. 42 U.S.C. § 2000e-l(a).

. See Puerta v. United States, 121 F.3d 1338, 1344 (9th Cir. 1997).

. 42 U.S.C. § 2000e-2(a).

. See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 335-36, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987); Little v. Wuerl, 929 F.2d 944, 949 (3d Cir.1991); cf. EEOC v. Pacific Press Publ’g Ass’n, 616 F.2d 1272, 1276 (9th Cir.1982) (discussing potential Free Exercise problems arising from the application of Title VII of the Civil Rights Act to religious organizations, but noting that Congress only exempted religious organizations from the ban on religious discrimination, not other forms of discrimination), abrogation on other grounds recognized by American Friends Serv. Comm. Corp. v. Thornburgh, 951 F.2d 957, 960 (9th Cir.1991).

. See Longview Fibre Co. v. Rasmussen, 980 F.2d 1307, 1313 (9th Cir.1992).

. 2A N. Singer & J. Singer, Sutherland Statutory Construction § 47:16 (7th ed.2007); see also United States v. Williams, 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); United States v. Belless, 338 F.3d 1063, 1068 (9th Cir.2003).

. 2A N. Singer & J. Singer, Sutherland Statutory Construction § 46:6 (7th ed.2007) (quotation marks and citations omitted); see also Exxon Corp. v. Hunt, 475 U.S. 355, 369, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986) (rejecting the reading of a phrase that made a latter phrase surplusage); United States v. Wenner, 351 F.3d 969, 975 (9th Cir.2003).

. 42 U.S.C. § 2000e(j) (emphasis added).

. See Matthew 5:16.

. See Isaiah 1:15-17; Isaiah 58:3-8.

. Isabel B. Terry, A Quaker Meeting and Mainstream Religion in a North Carolina Community, in Diversities of Gifts: Field Studies in Southern Religion 23, 23, 26 (Ruel W. Tyson, James L. Peacock & Daniel W. Patterson, eds., 1988).

. See Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 524-25, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

. 859 F.2d 610, 612 (9th Cir.1988).

. Berzon dissent at 1138 n. 5.

. 26 U.S.C. § 501(c)(3) ("Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.”).

. Chantelle Wallace, News Release, National Geographic CEO Says Nonprofit’s Mission is Bringing the World to Readers, University of Texas at Austin, McCombs School of Business, April 11, 2007, available at http://www. mccombs.utexas.edu/news/pressreleases/fahey 07.asp (last visited July 27, 2010).

. Arthur Hertzberg, The Jews in America 234 (2d ed.1997); Laura E. Weber, "Gentiles Preferred”: Minneapolis Jews and Employntent, 1920-1950, 56 Minn. Hist. 166, 170 (1991); Robert Katz, Continuing Their Mission, Jewish Hospitals Reinvest in Philanthropy, Forward, June 27, 2008, available at http://www. forward.com/articles/13591/; Dr. Barron H. Lerner, In a Time of Quotas, a Quiet Pose of Defiance, N.Y. Times, May 26, 2009, at D5.

. See Yutaka Yamada, Like My Husband's Shadow: The Religious Experience of a Japanese Warbride in North Carolina, in Diversities of Gifts: Field Studies in Southern Religion 177, 177-78 (Ruel W. Tyson, James L. Peacock & Daniel W. Patterson, eds., 1988).

. Judge Berzon seems to suggest that if Townley had organized a separate religious entity that did not sell mining equipment, just engaged in unquestionably religious activity, it would be wrong to allow the Townley Mining Company Church to restrict hiring to coreligionists, because it might "have a business impact, by reflecting positively on the profitmaking company’s corporate image.” By that reasoning, if a Jewish congregation has a plaque in the temple honoring a business donor for its contribution, then the congregation cannot discriminate in its hiring *1133 because the congregation reflects positively on the donor.

. See, e.g., Deuteronomy 6:6-7.

. 42 U.S.C. § 2000e-2(e)(2).